IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STEPHANIE R. BARTRAM,<br><br>                Plaintiff,<br><br>vs.<br><br>SARPY COUNTY SCHOOL DISTRICT 0037, and GRETNA PUBLIC SCHOOLS BOARD OF EDUCATION,<br><br>                Defendants. | 8:23-CV-474<br><br>MEMORANDUM AND ORDER |

This is an employment discrimination case. The plaintiff, Stephanie Bartram, alleges the defendants, Sarpy County School District 0037 and Gretna Public Schools Board of Education (collectively, the school), discriminated and retaliated against her, and failed to reasonably accommodate her disability, in violation of the Americans with Disability Act (ADA), 42 U.S.C. § 12112 *et seq*. This case is set for a non-jury trial. *See* filing 48. The school has moved for summary judgment on all of the plaintiff's claims. Filing 49. The Court will deny that motion.

I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City*

*of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are functions for the trier of fact, not those of a judge on a motion for summary judgment. *See id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the trier of fact could conceivably find for the nonmovant. *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

The plaintiff was a full-time fifth-grade teacher at Gretna Elementary School from 2011 until she was terminated in April 2022. As early as 2017, the plaintiff began struggling with her mobility. Eventually, she was diagnosed with hereditary spastic paraplegia, a progressive disease. She started using a walker, and began using a wheelchair sometime in 2019 or 2020. She also sometimes used a motorized scooter to help her get around. The parties agree

that the plaintiff is disabled for the purposes of the ADA.

Because of her mobility issues, the plaintiff had issues supervising her students during recess. It was challenging for her to keep up while she was using various mobility devices. *See* filing 52-1 at 47. In 2017 or 2018, another teacher saw the plaintiff fall while walking to the blacktop, and offered to switch duties—the plaintiff would cover morning duty, and he would supervise her class during recess. *See* filing 52-1 at 48. The plaintiff worked with other teachers to arrange and trade shifts.

The plaintiff did not formally request any accommodations from the school. Around December 2020, the school's principal, Andrew Rinaldi, reached out "to have a meeting and discuss accommodations" because the plaintiff was using a wheelchair more frequently. *See* filing 51 at 2. The meeting also included Dr. Rich Beran, the superintendent for the school district. The plaintiff asserts the meeting was called because Rinaldi was "concerned with her performing her job duties and their risk of liability in having a disabled teacher on staff." Filing 61 at 4.

The plaintiff said she was caught "off guard" during the meeting, and the conversation between the plaintiff and the administrators focused on what her plan was during any emergency. Filing 52-1 at 25. The plaintiff thought that she and the administrators would "come up with a plan together," but instead she was expected to come up with her own plan and present it. *See* filing 52-1 at 25. Because of the nature of her disease, the plaintiff had a hard time knowing what specific accommodations she would need long-term, and what short-term remedies would be helpful. Filing 52-1 at 26.

The plaintiff requested, as an accommodation, that the school repair the automatic function of the exterior doors. The plaintiff had relied on students opening the door for her. The school agreed to repair the doors, but, purportedly

3

due to the COVID-19 pandemic, those repairs were significantly delayed. *See* filing 65 at 6. The school told the plaintiff to continue relying on students to open doors for her.

The plaintiff also requested help with performing recess duty, either by trading recess and morning duties with other teachers, or by having a paraprofessional watch the students while at recess. The school denied these requested accommodations, even though the plaintiff had switched recess and morning duties with other teachers without assistance from the administration, and she had spoken with paraprofessionals who had the capacity to assist with recess duty. *See* filing 65 at 5; filing 52-1 at 43. The school asserted that recess duty was an essential function, and it could not accommodate her requests not to perform that duty.

As an accommodation, the school provided the plaintiff with a walkie-talkie so she could reach other teachers or staff members to assist her in an emergency. The plaintiff and the school also agreed that the plaintiff would bring in a mobility scooter to more easily supervise her students during recess. *See* filing 60-4 at 4. The plaintiff was confined to the "blacktop" of the recess area and could not get into grassy areas. During winter time, she had increased difficulties getting around due to the weather conditions.

The plaintiff had to complain about obstructions in hallways at the school more than once. *See* filing 65 at 7. The school asserts that every time the plaintiff complained, the school "promptly addressed the issue." *Id.* On January 31, 2022, the plaintiff informed the school that a snowblower was blocking the hallway. *See* filing 52-2 at 106.

*Administrative Leave and Termination Hearing*

In February 2022, the plaintiff was teaching social studies to another teacher's class. Filing 65 at 7. One of the students had been out of class for

4

several weeks because he was in a behavioral program. The plaintiff was rearranging desks for a new seating chart, and the missing student needed a spot. The other students began speculating where the missing student was: "sick with COVID, or in Hawaii, or in jail." Filing 65 at 8. According to the plaintiff, she told the students that the missing student was "at a place working on his behavior," and that he would need class support when he returned. *Id.*; *see also* filing 54-1 at 128.

A few days later, Rinaldi and Beran met with the plaintiff to discuss her comment. She was placed on administrative leave. The school asserted that the plaintiff's comment violated the missing student's privacy and was grounds for immediate termination. Rinaldi and Beran asked the plaintiff to resign. The plaintiff instead went forward with a school board hearing regarding termination.

Prior to the privacy incident, in her eleven years of teaching, the plaintiff had only once been formally reprimanded. *See* filing 55-1 at 161-269 (Bartram personnel file). That was for allowing an unauthorized person to use her key fob to access the school's gym. Filing 65 at 12. Yet, at her termination hearing, the school presented several reasons to justify terminating her beyond the privacy violation that initiated the process. Those reasons included providing administrative documents late and failing to watch professional development videos. *See, e.g.* filing 54-1 at 21; filing 53-1 at 282. While the plaintiff had received emails about those incidents, she was never disciplined, and the only record of these incidents in her personnel file is in a letter suggesting she resign due to the privacy violation. *See* filing 55-1 at 162. The school asserts the problems referenced during the termination hearing "were ancillary" to the privacy violation. Filing 65 at 13.

Following a hearing in front of the school board in April 2022, the

5

plaintiff was terminated. The plaintiff's job duties were taken over by a paraprofessional.

### III. DISCUSSION

1. DISCRIMINATION AND RETALIATION UNDER *MCDONNELL DOUGLAS*

The ADA prohibits employers from discriminating against employees on the basis of a disability. *Anderson v. KAR Global*, 78 F.4th 1031, 1036 (8th Cir. 2023). It also prohibits retaliating against employees for engaging in statutorily protected activity. *Id*. In the absence of direct evidence of discrimination or retaliation, the plaintiff may establish an inference of either under the *McDonnell Douglas* burden-shifting framework. *Id.*; *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under that framework, a plaintiff must first establish a prima facie case. For discrimination, a plaintiff must show that (1) she is disabled, (2) she is qualified to perform the essential functions of the job, and (3) she suffered an adverse employment action because of the disability. *Anderson*, 78 F.4th at 1036. And for retaliation, a plaintiff must show (1) that she engaged in a statutorily protected activity, (2) that the employer took an adverse employment action, and (3) a causal connection between the two. *See Prod. Fabricators*, 763 F.3d at 972.

If a plaintiff succeeds at this first step, the burden shifts to the employer to show a legitimate, nondiscriminatory or nonretaliatory reason for the adverse action. *Anderson*, 78 F.4th at 1036. The burden then shifts back to the plaintiff to show that the proffered reason was, in reality, a pretext for discrimination or retaliation. *See id*. at 1037.

To survive summary judgment regarding pretext, a plaintiff need only

adduce enough admissible evidence "to raise a genuine doubt as to the legitimacy of the defendant's motive." *Id.* at 1038 (quoting *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021)). A plaintiff may create a genuine issue of material in a variety of ways, such as persuading the court that a prohibited reason more likely motivated the employer. *Id.*; *see also Huber v. Westar Foods, Inc.*, 139 F.4th 615 at 625 (8th Cir. 2025). Evidence of pretext is viewed in its totality. *Hairston*, 6 F.4th at 844.

Plaintiffs can show pretext through "others-were-treated-better evidence." *E.g.*, *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1135 (8th Cir. 2020). Such requires a plaintiff to show others who engaged in the same conduct without any mitigating or distinguishing circumstances. *Id.* Another example of pretextual evidence is "shifting-explanations evidence," where an employer gives varying explanations for its actions over time. *Id.*

As is often the case, the parties do not dispute that the plaintiff can establish the first two elements of both prima facie cases. *See* filing 50 at 7; filing 50 at 21.[1] Rather, the school argues that the plaintiff has failed to establish an inference that her disability and accommodation requests were causally connected to her termination.

### *Discrimination*

The school argues that the onset of the plaintiff's disability occurred over

---

[1] The school contends that the plaintiff "is unable to prove any of the elements for her retaliation claim," filing 50 at 20, but the substance of the argument is premised on causation. The plaintiff asserts that she requested an accommodation—that the school remove objects in the hallway—only a few weeks before she was placed on administrative leave. The school does not dispute those facts, so the plaintiff has satisfied her *prima facie* burden of showing a protected activity and an adverse employment action.

a year before her termination, defeating any causal connection. The plaintiff argues that causation can be inferred by the school's "hostility and annoyance" towards her between December 2020 and February 2022. Filing 59 at 11. She also asserts that the circumstances around her termination support an inference of discrimination.

The Court is satisfied that the plaintiff has met her *prima facie* burden. She has evidence of disparate treatment: that she was punished more severely for the privacy violation than her non-disabled peers. The school asserts that there were three other employees who had incidents involving privacy violations, and there is only one "apt comparator, due to the severity of" the plaintiff's incident. Filing 64 at 5. The three identified instances of privacy violations are:

- A teacher filmed several TikTok videos in which students appeared (the teacher was given a written reprimand);

- A teacher had a conversation with another teacher at a different school about a student's behavior (the teacher was given a verbal reprimand); and

- A school secretary took a picture of a disabled student's buttocks and shared it with another employee to make fun of the student (the secretary was subject to immediate termination).

Filing 64 at 7. The school claims that the only comparable incident to the plaintiff's behavior—telling a group of students that another student was "at a place working on his behavior"—is when the secretary sent a photograph of an undressed student to mock him.

The Court is not persuaded. From the school's own descriptions of the privacy events, the trier of fact could find the plaintiff's actions more closely

resemble the teacher who posted her students on a global social media phone app, rather than the secretary who was subject to immediate termination. The school's attempts to distinguish the plaintiff's behavior from the instances described above do not, as a matter of law, demonstrate a lack of causation between the plaintiff's disability and the decision to terminate her.

The plaintiff's evidence that the school took several years to repair the broken automatic doors further supports a causal connection between the plaintiff's disability and her termination. Cf. *Prod. Fabricators*, 763 F.3d at 970 ("The year-long time period that [the employer] accommodated [the plaintiff's] injury negates causation").

Relatedly, while the school puts forward an alleged legitimate, nondiscriminatory reason for firing the plaintiff (the privacy violation), the above discussion indicates that the plaintiff has met her initial burden of showing pretext. The plaintiff was allegedly treated differently than similarly situated employees. Additionally, the plaintiff has evidence of the school's shifting explanations for the employment decision, and there is a factual dispute as to whether the school contravened its regular disciplinary policies. *See* filing 59 at 14, 19; filing 65 at 3. The plaintiff has met her burden by adducing enough admissible evidence to raise a genuine doubt as to the legitimacy of the school's motive for terminating her, and a reasonable trier of fact could find that the school's focus on the plaintiff's privacy violation was just an excuse for the decision to terminate her. See *Anderson*, 78 F.4th at 1038; *Huber*, 139 F.4th at 625.

Of course, this Court will be the trier of fact—and context and credibility of both parties' witnesses will assist this fact finder in reaching a just decision. But the motion for summary judgment on this issue will be denied.

*Retaliation*
9

The plaintiff asserts that a few weeks before her suspension, on January 31, she complained to Rinaldi that "the hallways were blocked with equipment and boxes so she could not navigate the area during a fire drill." Filing 61 at 21-22. She frames this as a request for an accommodation for which she was retaliated.

Requesting an accommodation is a statutorily protected activity. *Anderson*, 78 F.4th at 1036; *Kirkeberg v. Canadian P. Ry.*, 619 F.3d 898, 908 (8th Cir. 2010). And termination is an obvious adverse employment action. *Hill v. Walker*, 737 F.3d 1209, 1219 (8th Cir. 2013). However, generally, more than a temporal connection between a request for an accommodation and an adverse employment action is required to present a genuine factual issue on retaliation, unless the temporal proximity is "very close." *Anderson*, 78 F.4th at 1037.

However, for the same reasons discussed for her discrimination claim, the plaintiff has satisfied her burden on summary judgment on her retaliation claim. She has demonstrated a *prima facie* case, and she has presented sufficient evidence to withstand summary judgment on the issue of pretext. The temporal connection between her requested accommodation and her termination is even stronger than the proximity between her disability and termination; and the other evidence discussed above raises an inference that a prohibited reason more likely motivated the school. *See id.* at 1038. Again, this Court will consider all of the evidence in context; but the motion for summary judgment on this issue will likewise be denied.

2. FAILURE TO ACCOMMODATE

The plaintiff also claims that the school failed to accommodate her disability and failed to engage in an interactive process. *See* filing 59 at 24. The plaintiff asserts that she was left to come up with accommodation plans on her

own, after Rinaldi asked her what she intended to do during an emergency. *See* filing 52-1 at 25. The plaintiff requested that automatic doors be repaired, that she have assistance performing recess duty (either by shifting duties with other teachers, or having a paraprofessional help her), and that the hallways be kept clear of any obstacles in case there was an emergency. The school accommodated the plaintiff by providing her a walkie-talkie.

Reasonable accommodation claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. Rather, "a modified burden-shifting analysis" is applied. *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). First, a plaintiff "must establish both a *prima facie* case of discrimination based on disability and a failure to accommodate it." *Powley v. Rail Crew Xpress, LLC*, 25 F.4th 610, 612 (8th Cir. 2022). That is, a plaintiff must have evidence that would prove she suffered an adverse employment action because of the disability. *Hopman v. Union Pac. R.R.,* 68 F.4th 394, 402 (8th Cir. 2023). For many of the same reasons discussed above, the Court is satisfied the plaintiff has demonstrated a *prima facie* case.[2]

---

[2] "Whether a failure-to-accommodate claim requires proof of an adverse employment action has generated sharp controversy" outside of the Eighth Circuit. *Hopman,* 68 F.4th at 402 (citing *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784 (10th Cir. 2020) (en banc)). It's true that, under these circumstances, it is difficult to square a plaintiff's claims of failure-to-accommodate, disability discrimination, and retaliation based on the same alleged adverse employment action.

For the purpose of the present summary judgment motion, the plaintiff is able to pursue multiple theories of why she was terminated: because she was disabled, because the school was retaliating against her for requesting accommodations, because the school did not want to accommodate her, or even some combination of the three. The evidence of these claims significantly overlap, but each are viable under the ADA. The plaintiff, should she choose, will be able to pursue each theory at trial.

After demonstrating a *prima facie* case, a plaintiff has the burden to show a requested accommodation is "reasonable on its face, *i.e.,* ordinary or in the run of cases." See *Peebles,* 354 F.3d at 768 (quoting *US Airways, Inc. v. Barnett,* 535 U.S. 391, 401 (2002)). The burden then shifts to the employer to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstance." *Id.* (quoting *Barnett,* 535 U.S. at 401).

In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. *Id.* "The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability." *Id.* at 767. The ADA defines "reasonable accommodation" as including:

> (A) making existing facilities used by employees readily accessible to and useable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

§ 12111(9).

There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it requires an employer to eliminate an essential function of a job. *EEOC v. Convergys Cust.*

*Mgmt. Grp.,* 491 F.3d 790, 796 (8th Cir. 2007); *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 950 (8th Cir. 1999). Nor is an employer obligated to hire additional employees or reassign existing workers to assist a disabled employee in fulfilling her essential duties. *Fjellestad,* 188 F.3d at 950. To determine whether an accommodation is necessary and, if so, what the accommodation may be, the employer and the employee must engage in an "interactive process." *Prod. Fabricators,* 763 F.3d at 971.

### *Essential Functions*

The school contends that the plaintiff's accommodation requests involving recess duty were not reasonable because they would have eliminated a purported essential function of her job. The school asserts that supervising children during recess is an essential function of the plaintiff's job as a teacher, and reassigning that duty to a paraprofessional or other teacher was not a reasonable request.

Essential functions are the fundamental job duties of the employment position. *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015). They do not include the marginal functions of the position. *Id*. In determining whether a job function is essential, relevant considerations include, but are not limited to:

> (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents on the job; and/or (vii) the current work experience of

incumbents in similar jobs.

*Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) (quoting 29 C.F.R. § 1630.2(n)(3)).

While the employer's judgment about an essential job function is considered highly probative, it is not conclusive. *Minnihan v. Mediacom Comms. Corp.*, 779 F.3d 803, 812 (8th Cir. 2015). After all, were conclusive weight given to the employer's opinion on this issue, any employer would escape ADA liability simply by defining job duties in a manner that excludes disabled employees. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 787 (8th Cir. 2004).

In the present case, viewing the facts in the light most favorable to the plaintiff, there is a material question of fact as to whether recess duty was a function that could not have modified to accommodate the plaintiff. To begin, the record contains evidence that the amount of time performing recess duty is minimal—about twenty minutes per day. *See* filing 52-1 at 43. And it's questionable whether the consequences of allowing the plaintiff to trade recess and morning duties are severe enough to consider recess duty "essential." The plaintiff made arrangements with other teachers without involvement from the school's administration for two years. *See* filing 60-5 at 2. While the parties dispute how well the plaintiff's accommodation worked, *see* filing 52-1 at 34-35, a trier of fact could find that recess duty was not "essential" because the plaintiff avoided that job function for two years without issue. But the Court will carefully consider all evidence presented at trial.

### *Interactive Process*

Employers and employees have a shared responsibility to resolve accommodation requests. *Convergys*, 491 F.3d at 795. The employee generally

has "better access to information concerning [her] limitations and abilities, whereas the employer will typically have better access to information regarding possible alternative duties or positions available to the disabled employee." *Id.* An employee is not responsible for requesting a specific reasonable accommodation. *Id.*

There is conflicting evidence in the record as to whether the plaintiff fulfilled her obligation in the interactive process to provide necessary information about her medical needs and her conditions. *Compare* filing 52-1 at 26, *with* filing 52-2 at 60 ("she was very open and willing to talk about her condition"). Based on the progressive nature of her disease, it was difficult for the plaintiff to predict what she would need in terms of accommodations. But it was clear, both to the plaintiff and the school, that her condition was worsening, and changes might need to be made to her job duties to ensure her safety and the safety of her students. *See, e.g.,* filing 52-2 at 60-61; *see also Convergys*, 491 F.3d at 795 (an employee who accommodates herself has "exceeded what disabled employees at the initial stage of the interactive process must do").

From the plaintiff's version of events, she had been modifying her job duties to accommodate herself before the school administration got involved. *See* filing 52-1 at 47-48. The school then asked the plaintiff what her plan was in an emergency, rather than engaging in a good-faith process to identify how to accommodate her to address the school's concerns. *See* filing 52-1 at 25. There exist several disputed material facts about the school's participation in the interactive process, and whether the school sought to accommodate the plaintiff, or was looking for a reason to criticize her.

The plaintiff also asserts she requested for the handicap accessible doors to be fixed. It's undisputed it took several years to fix the doors (if the doors

15

were ever repaired at all). *See* filing 65 at 6. The school asserts that the COVID-19 pandemic delayed the repairs, but does not explain whether it took any action in the meantime to make the school more navigable for the plaintiff. The plaintiff was left to rely on her students and peers to enter and exit the building. *See* filing 52-1 at 30.

It appears from the record that the plaintiff was able to perform recess duty by bringing her own mobility scooter to school rather than relying on her wheelchair. She said she was able to "provide my own accommodation." *See* filing 52-1 at 50. It seems it would be difficult for *any* wheelchair-bound teacher to perform recess duty, and the school had no solutions to address a teacher with mobility issues supervising students during recess.

The plaintiff, and the school, were concerned about the plaintiff's safety in the event of an emergency. The automatic doors did not function, and there were sometimes objects blocking the hallways. The school contends that every time the plaintiff complained about obstructions in the hallway, the issue was "promptly addressed." Filing 65 at 7. But in an actual emergency situation, the obstructions would cause a significant hazard, and the school has made no showing thus far that it tried to *prevent* hallway obstructions to accommodate the plaintiff—rather, it would just try to promptly respond after the plaintiff complained.

The plaintiff has presented evidence that the school did not engage in an interactive process in good faith in order to accommodate her disability. Relatedly, the plaintiff has presented a need for accommodations that the school did not accommodate. And the plaintiff has presented evidence of circumstances that give rise to an inference that the school's decision to terminate her was because of her disability and her need for accommodations. The school, certainly, has competing evidence—but viewing the facts in the

plaintiff's favor *at this stage*, the Court is persuaded that there is an issue of fact as to whether the school had unlawful motives when it chose to terminate the plaintiff after she disclosed "private" information about a student. Again, the Court will hear and assess all evidence, in context, at trial. But the motion for summary judgment on this issue will be denied.

## IV. CONCLUSION

The plaintiff has presented sufficient evidence to withstand the school's summary judgment motion. Her claims of disability discrimination, retaliation, and failure to accommodate will proceed to trial. For the above reasons,

IT IS ORDERED that the school's motion for summary judgment (filing 49) is denied.

Dated this 11th day of August, 2025.

BY THE COURT:

John M. Gerrard
Senior United States District Judge
